**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff<br>V.<br>ANGEL SIERRA RIVERA<br>Defendant | Criminal No. 05-165 (JAF) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**

**TO THE HONORABLE COURT:**

DEFENDANT **Angel Sierra-Rivera**, by his attorney, and very respectfully submits his Memorandum in Support of his Motion to Suppress:

## I. STATEMENT OF FACTS

1. On March 8, 2004, a team of agents from the HIFCA San Juan Group-B were engaged in a currency pickup and seize operation. SS/A Palo D. Robles, as acting as cover team of SS/A Luis Ortiz and TF/A Carlos Ortiz, which were acting as undercover agents. (See Exhibit I - Report of TF/A Ricardo Martínez, March 8, 2004).

2. On March 4, 2004, S.A. Luis Ortiz tried to make a consensually monitored telephone call to phone number (787) 295-4607 for a possible pickup of $350,000.00 for narcotics proceeds. The call was to Jaime, known as Calvo or Pablo. This call did not go

through since the telephone number had been temporarily disconnected. (See Exhibit II - Transcript of telephone conversations).

3. On March 8, 2004, Agent Ortiz, again acting in an undercover capacity recorded a consensual telephone call to number (787) 962-5976. This call was to the same individual named Jaime known as Calvo or Pablo. This call was of a possible pickup of $350,000.00 (See Exhibit II - Transcript of telephone conversations). From that recorded conversation there are no indications that Agent Ortiz and this person named Jaime known as Calvo or Pablo, were going to meet. No other recordings conversation have been produced by the Government during discovery.

4. According to the report by TF/A Ricardo Martínez, on March 8, 2004, at approximately 12:20 p.m., the agents were at the Norte Shopping Center in Santurce, Puerto Rico. A cover team observed in the parking lot the arrival of the under cover vehicle. They later saw what the agents characterized as an unidentified tall male wearing blue jeans and a gray white shirt with stripes carrying a white cloth bag with red handles hanging from his left shoulder. This person came out of a gray Toyota Camry and walked near the official vehicles toward Western Auto. Agent Carlos Ortiz claims that he alerted the cover team that the target had the currency with him. The agents did not make any transactions at that place. According to the memorandum by TF/A Ricardo Martínez the unidentified male went back to the 2002 Toyota Camry, Puerto Rico license plate #ENK-971, and left Norte Shopping Center. (See Exhibit I).

5. At Loiza Street TF/A Lemuel Rivera and TF/A Harvey González in uniforms of the Police of Puerto Rico and in a Police of Puerto Rico patrol made what Agent Martínez

characterizes as a controlled vehicle stop. According to the agents, defendant Sierra gave consent for a vehicle inspection and they found three bags containing a large sum of United States currency. From there, defendant Sierra was transported to the Loíza Street Police Station.

6. At the Police Station, defendant Sierra was interviewed by SS/A D. Robles and TF/A Martínez. According to the agents, defendant Sierra provided his personal information and gave statements about the origin of the currency. (See Exhibit I).

7. As part of the discovery, the Government provided the defendant a document titled *Record of Sworn Statement* from the Department of Homeland Security, Immigration and Customs Enforcement. This document informs the defendant that the agents want to interview him in relation to his arrest warrant. The document contains the Miranda Warning. On page 2 of the document, the defendant accept that he understands the right that were read to him and that he wants an attorney. (See
Exhibit III). Nor attorney was provided to Mr. Sierra on that day.

8. Defendant Sierra vehicle was stopped by the task force agents. According to the report of the investigation submitted by SS/A Palo D. Robles, the Puerto Rico Police Department performed the vehicle stop of the Toyota Camry for having tinted windows in violation of Traffic Law. According to the report of investigation, defendant Sierra was asked for his consent to search the vehicle and he agree. It was in the trunk of the vehicle that the agents discover the three bags that contained the U.S. currency. (See Exhibit IV).

9. The vehicle stopped and the search conducted by the agents was videotaped from an airplane of the Homeland Security, Immigration and Customs Enforcement.[1]

10. The videotape clearly shows that defendant had been arrested and handcuffed before any search of the vehicle was conducted.

11. The defendant had a reasonable expectation of privacy against such an unconstitutional and intrusive seizure and searches.

12. Defendant reserves his right to raise any other factual and/or legal issues that may develop during the suppression hearing.

## II. ARGUMENT

### A. The arrest of Sierra by the Puerto Rico Police was illegal as the Task Force Agents did not rely on reasonably trustworthy facts and circumstances, or have information upon which a reasonably prudent person would believe the defendant had committed a crime, thus lacking probable cause.

In California v. Hodari D., 499 U.S. 621, (1991) the U.S. Supreme Court expressed that "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.".

In what is called the second tier of interaction between law enforcement and private citizens, we find what is commonly know as an investigative or Terry stop. *See* Terry v. Ohio, 392 U.S. 1 (1968). An investigative or Terry stop "occurs when a police officer,

---

[1]This statement is supported by the Surveillance videotape of March 8, 2004 provided by the Government as part of the Rule 16 discovery materials. A copy of said videotape is not attached to this memorandum. However, if in deciding to grant a suppression hearing, this Honorable Court deems necessary to view the aforementioned videotape, the defense will immediately submit a copy to the Court.

acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* This type of seizure will be found constitutionally permissible if the "**officer's action was justified at its inception, and[ ] if ... the action taken was reasonably related in scope to the circumstances which justified the interference**." *Id.* (Emphasis ours).

To meet the first prong of the investigative stop analysis--that is, whether the intrusion was justified at its inception--" 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " United States v. Young, 105 F.3d 1, 7 (1st Cir.1997) (*quoting* United States v. Kimball, 25 F.3d 1, 6 (1st Cir.1994). In assessing whether the second prong is satisfied, the court must consider the totality of the circumstances surrounding the interference, including all the information gleaned by the intervening law enforcement official during the stop. *See id.*; United States v. Owens, 167 F.3d 739, 748 (1st Cir.1999).

We recognize that deference is due to the experienced perceptions of the officers, see Ornelas v. United States, 517 U.S. 690, 699-700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), but this cannot be blind deference; as these perceptions must be reasonable under an objective standard, see Terry, 392 U.S. at 21. In this case, there are no articulable facts particular to Sierra that provides support for probable cause to arrest. As a fact, the Task Forde Agents who arrest Sierra used the pretext of a traffic stop for tinted windows. (See Exhibit IV).

Finally, the remaining tier of the Fourth Amendment analysis comprises de facto arrests, requiring probable cause. See Young, 105 F.3d at 6. "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts, and as such must be evaluated in light of the totality of circumstances." United States v. Martínez-Molina, 64 F.3d 719, 726 (1st Cir.1995) (*quoting* Illinois v. Gates, 462 U.S. 213, 232 (1983) and United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir.1994). "The inquiry into probable cause to arrest focuses," therefore, "on what the officer knew at the time of the arrest." United States v. Brown, 169 F.3d 89, 91 (1st Cir.1999).

And, while there is no "scientifically precise formula" to determine whether any particular mode of detention amounts to a *de facto* arrest, United States v. Taylor, 162 F.3d 12, 21 (1st Cir.1998) (citation omitted); *see also* United States v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir.1998) (no "litmus- paper test") (citation omitted), an investigative stop is ordinarily deemed a de facto arrest "when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." Young, 105 F.3d at 7.

In the instant case, the vehicle stop of Sierra was not a lawful Terry stop as it was not justified with **concrete** and **reasonable** suspicion of criminal activity nor was it a valid traffic stop. None of the agents conducting the surveillance had observed Sierra committing a crime. We have not received any evidence that provides the government with probable cause to detain and arrest him.[2] And since Sierra did not commit any traffic

---

[2]It is established law that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," Ybarra v. Illinois, 444 U.S. 85,91 (1979).

violation that would allow the Police to legally stop him and search his vehicle and its contents, the ruse of tinted windows was illegal and as such, the search of the contents of the trunk of his car was also illegal. *See* Wyoming v. Houghton 119 S.Ct. 1297 (1999) (Conditioning the extension of the automobile warrant exception allowing searches of contents of vehicles based on the driver's violation of the traffic laws or misconduct.)

Furthermore, as confirmed by the disturbing visuals of the surveillance videotape, the defendant was stopped, arrested and handcuffed immediately. The evidence clearly reflects that he was arrested before the search of the vehicle.

B. **The warrantless and without consent search and seizure of the monies inside Sierra's trunk by the Puerto Rico Police Task Force, violates the Fourth Amendment's constitutional ban on illegal search and seizures.**

As the government is aware that the search of the contents of Sierra's trunk does not fall within the automobile warrant exception contemplated in Houghton, therefore it relies in a dubious allegation of consent by Sierra. We characterize the allegation of consent in that manner because, the defendant expressly denies giving any valid or voluntary consent to the search of his car and the surveillance videotape clearly contradicts any allegation of voluntary or valid consent.

We recognize that valid consent renders a warrantless search constitutionally permissible, and said consent consent must be voluntary to be valid. *See* Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Furthermore, it is the prosecution's burden to establish, by a preponderance of the evidence, that consent was "freely and voluntarily given;" and that there was more than mere acquiescence in the face of an unfounded claim of present lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548 (1968)

(suppressing fruits of search where consent was founded on police officer's false assertion that he had a search warrant). This Honorable Court's conclusion as to whether consent was freely given must take into account the totality of circumstances surrounding the interaction between the defendant and the authorities. *See* United States v. Deutsch, 987 F.2d 878, 883 (2d Cir.1993).

Relevant factors include the defendant's knowledge of his constitutional right to refuse to consent, the defendant's age, vulnerability, intelligence, education, the degree to which he cooperated with the police, and the use of punishment or other coercive behavior. Schneckloth at 226; United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir.1993). In this case, Defendant was stopped, taken out of his vehicle and handcuffed. After that, this vehicle was searched. There was no valid, voluntary and intelligent consent to the search. (See videotape of March 8, 2004).

**C. The defendant's statements as to the seized monies must be suppressed because they were obtained pursuant to an illegal arrest and detention.**

In the government's version of events it is claimed that Sierra provided uncoerced statements as to the seized monies. These statements must be suppressed as they were extracted pursuant to an illegal detention and search and thus, are the "fruit of the poisonous tree".

The U.S. Supreme Court first pronounced the "fruit-of-the-poisonous- tree" doctrine in Wong Sun v. United States, 371 U.S. 471 (1963). The "fruit" is evidence derived from an illegal source in this case the illegal arrest and detention of defendant by TFA Alverio,

the poisonous tree. In Wong Sun, the Court held that evidence and witnesses discovered as a result of an illegal search is "tainted" and must be excluded.

It is well settled that this "tainted-fruits" analysis only applies when a defendant's constitutional rights have been infringed. United States v. Elie, 111 F.3d 1135, 1141 (4th Cir.1997) (*citing* United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1048 (9th Cir.1990) (finding that the "tainted-fruits" doctrine does not apply to physical evidence obtained as a result of a Miranda violation). *See generally,* Oregon v. Elstad, 470 U.S. 298 (1985).

However, the circumstances surrounding the case at bar do elevate the government's infringement of defendant's rights to a constitutional level. The defendant, without articulable and reasonable suspicion was illegally detained and arrested without the existence of probable cause to do so. The government only extracted the aforementioned statements as a direct result of seizing defendant's monies after the arrest and by not providing access to an attorney as requested by defendant. Since this Honorable Court must find that the defendant's arrest was executed without a warrant consent or probable cause, thus finding it illegal, it must then find that the seizure by the Puerto Rico Police of defendant's monies and any statement regarding said monies was also illegal, and as such, must be suppressed.

## III CONCLUSION

As notably expressed in United States v.$40,000.00 in U.S. Currency, 999 F.Supp. 234 (D. Puerto Rico 1998, Casellas, J.): "...we agree with the Supreme Court in that "[t]his court ... is not empowered to suspend constitutional guarantees so that the government may more effectively wage a 'war on drugs.' If the war is to be fought, those who fight it

must respect the right of individuals, whether or not those individuals are suspected of having committed a crime." *citing* Florida v. Bostick, 501 U.S. 429, 439 (1991).

In the instant case, the defendant has met his burden to establish the need for an evidentiary hearing and the suppression of the physical evidence and all the fruits of the illegal search.

**WHEREFORE,** the defendant, for the reasons stated above, very respectfully requests an evidentiary hearing on his Motion to Suppress.

**RESPECTFULLY SUBMITTED,** in San Juan, Puerto Rico, this August 25, 2005.

**CERTIFICATE OF SERVICE**: I hereby certify that on August 25, 2005, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: AUSA, Mr. Timothy R. Henwood (timothy.henwood@usdoj.gov); Mr. Víctor A. Ramos-Rodríguez (abogpr@aol.com).

s/Juan R. Acevedo-Cruz
**JUAN R. ACEVEDO-CRUZ** (120701)
*ATTORNEY FOR DEFENDANT*
*ANGEL SIERRA RIVERA*
174-A O'NEILL STREET
SAN JUAN PR 00918
TEL. (787) 751-2341
FAX. (787) 751-2795
Email: jracevedo@coqui.net